The United States Court of Appeals for the Federal Circuit is now open and in session. God Save the United States and this Honorable Court. Alright. Counsel, are we ready to begin? Yes, Your Honor. Okay. Mr. Day, you'll have three minutes for rebuttal. Thank you. You may begin. Well, good morning, Your Honors, and may it please the Court. This is James Day on behalf of Level Sleep. Now, this appeal turns on claim construction. There's no dispute that under the district court's original construction of the terms low body pressure and low supporting surface pressure, summary judgment was improper. That original construction was pressure of a level which materially reduces causes of bed-induced shifting. And the district court acknowledged, both during the summary judgment hearing and in the order granting summary judgment, that Level Sleep submitted admissible evidence showing that the accused beds meet that original claim construction. Counsel, is it your position, Mr. Day, that the district court judge has no authority to alter its claim construction position? No, Your Honor. We're not suggesting that he could not have changed it. What we're saying is he did change it and he changed it in the summary judgment order. So, we submitted evidence that met the original construction, and in the summary judgment order, he applied an additional limitation, which is the only way that summary judgment was granted. So, are you saying that it was noticed that that was the problem? Well, frankly, I'm not saying-there was no notice.  I think the problem is that we were not given the opportunity to evaluate infringement under the construction that was applied in the summary judgment order. For instance, we didn't consider whether the doctrine of equivalence might apply. That's a problem. I think the more fundamental problem here, Your Honor, is the judge adopted a construction that imported a limitation of 40 millimeters of mercury into the claims without full briefing. I mean, that construction was never suggested during the Markman proceedings until a rebuttal argument in the oral argument. It was the first time that 40 was suggested as some sort of numeric limitation. Well, didn't the court, in its first claim construction, didn't it mention figures 4 and 10 and talk about outer limits, sort of in the second half of its construction? Yeah. In the claim construction order, the judge said that there were-it mentioned upper limits and cited to figure 10 in the 172 patent, and I think it's a two-sentence passage. He did not say that 40 is an upper limit, and in the proceedings, neither party in their papers had said 40 was an upper limit. What we had suggested was that if you were going to use figure 10 and the related text to impose numeric limitations, it should be what's illustrated there-80 at the shoulders, 40 at the waist, and 80 at the hips. So we understood him to reject numeric limitations, but had he adopted one, or if that upper limit was based on figure 10, it should have been based on the figure, not the pressure at the waist in that figure. So the logic didn't follow, and I think the problem with where we ended up is you've got a construction that was never fully argued by the two parties until we get to this appeal. Counsel, this is Judge Stoll. I didn't quite understand your brief to be raising the notice problem that you're talking about. I certainly understood your brief to be challenging the district court's modified construction. Where in your brief do you talk about a notice problem and talk about how you would have presented other evidence to argue doctrine of equivalence? For example, had you known of the court's claim construction? Your Honor, we did not say that in our briefing. I'm trying to explain, I guess, two things. One is the appeal is not based on lack of notice. The lack of notice, I think, is what leads to an incorrect construction. It's sort of just the procedural history led us to a place where you have what I think is a facially incorrect construction. Okay, but you're relying on, just to interrupt for a minute, you are relying on conventional doctrines of claim construction for your argument that the district court's construction is incorrect. I'm not going to look at the history, for example, of where that construction, how it was modified by the court because you haven't really raised that. Instead, your argument is that based on the intrinsic evidence in the plain claim language and specification, the district court went too far in setting a particular limit on the claim term low pressure, right? That's correct, Your Honor. The appeal turns on the correct construction, which we think is the original construction that the court issued, and that imposing a limit of 40 is simply an incorrect construction. If you agree with that, then summary judgment was incorrect. The only way that summary judgment could be entered was by adding that further incorrect limitation. Well, even assuming that we believe that the original construction wasn't bounded at all, which in my mind you'd have to take out this whole discussion of figures 4 and 10, that construction would be indefinite, would it not? Well, I'm not suggesting that the construction is not bounded, Your Honor. What we're suggesting is you don't need a specific numeric limitation. The terms low body pressure, low supporting surface pressure have an objective boundary, an objective baseline. It's pressure of a level that materially reduces the causes of bed-induced shifting. So that's an objective measure of- Materially as compared to what? Well, as compared to conventional mattresses- Meaning innerspring mattresses, right? That's correct, Your Honor. So the patent tells us conventional mattresses are innerspring mattresses, and it provides an example of such a conventional innerspring mattress in figure 10. We see a woman of a particular size lying on that conventional innerspring mattress. It shows that her body is not aligned, her back is sagging in the middle, and it gives us the pressures that such a person would typically experience. They're 80 at the shoulders and hips, 40 at the waist, 30 on the legs. And then in the very next figure, figure 11, it shows that same person lying on one embodiment of the inventive mattress. And you can see what the invention is about is having different zones of different firmness foam so that at the shoulder and the hips, the body is allowed to compress further into the mattress. This is just Toronto. Can I just ask this? Am I remembering incorrectly that was it column 16? Column 15 talks about figure 10 and explains that's not a very satisfactory situation. And then column 16 talks about figure 11 with the improved mattress. Am I remembering right that column 16 says that in figure 11, not just the waist and legs, but the hips and shoulders are down around 30? Well, so with the language, I think you're thinking of, Your Honor, is-let me get to that. What it says is you'll have-let's see if I'm looking at the same thing. Yeah, in column 16, there's a statement that says the pressure will be typically low and below a low pressure threshold. And for a tuned bed made of properly selected foams and materials, that pressure threshold will be below the ischemic pressure or 30. So with that, there's a couple of things to note here. One, it's not limiting the invention to 30. What it's saying is you may have low pressure, which is the language of claim one, the independent claim. It can also be below a low pressure threshold, which is recited in dependent claim 11, which narrows the concept of low body pressure. And really, in an ideal case, the preferred embodiment would get all of the pressures down to the ischemic pressure threshold of about 30. And that's claim 12, the narrowest of those dependent claims that we talk about. Another thing to note here-and so when I read this, when we read this language, it's telling us about the preferred embodiment, a preferred embodiment of this invention. It's important to note, though, Your Honor, that this language doesn't appear with every embodiment. In our reply brief, we cite discussion of another embodiment where it doesn't refer to the ischemic pressure at all. It does say that the surface pressure at the shoulder and the hips will be low. It doesn't mention lowering pressure at the waist. Where in this spec are you referring to? It's our reply brief. Actually, here we go. It's in column 30. So in column 30, starting at lines 23 through about 28, it talks about there's reduced pressure at the shoulder because the zone allows the shoulder to compress further into the mattress. Then there's some talk about the waist providing support for the waist and holding the body in alignment, which is part of what this invention requires. And then later in column 30 toward the bottom, starting at line 60, there's discussion that the hip is also allowed to compress further into the mattress, creating low surface pressure. So there, it's not that there's no mention of ischemic pressure here. And so what the specification is telling us in these examples and in others that refer to the ischemic pressure as an ideal mattress would reach the ischemic pressure, and the invention is intended to better approach those ideal characteristics. The patent is teaching us is that you can improve on the pressure and alignment of prior art mattresses by reducing the causes of bed-induced shifting. So you reduce the pressure, particularly at the shoulder and the hips, to reduce tossing and turning. And in an ideal case, in the best case, the preferred case, you would get all the way down to the ischemic pressure threshold. Again, that's confirmed by the way the claims are structured, which start with low body pressure, low supporting surface pressure, and then only in a dependent claim give you that ischemic pressure threshold. Mr. Day, this is Judge Stoll. I want to ask you about another sentence that I don't think you've mentioned in the specification. And that's, for example, at JA93, column 9, lines 32 through 35. And there there's what appears to be a lexicographical definition. It says the terminology low body pressure means a pressure which is below a pressure threshold, typically the ischemic threshold, for comfortable sleep and a level which materially reduces causes of bed-induced shifting. And I know it has that part about the comfortable sleep and level and so on, but it says it means a pressure which is below a pressure threshold. So that seems to be some sort of express definition coming from the embedders. And then when you have to look through the specification then to understand what that pressure threshold is, right, do you agree with that as being a proper approach for claim construction? As to your first part of the question, I do think the sentence that you're citing in column 9 is important. It tells us that low body pressure is pressure of a level which materially reduces causes of bed-induced shifting. That gives us the objective baseline we need, or that a person of ordinary skill in the art needs, to assess the term low body pressure and low supporting surface pressure. The first part of the sentence tells us something about pressure for comfortable sleep, which is not part of the district court's construction and frankly is somewhat subjective. So it tells us what the goal is, but it doesn't add to the objective baseline for assessing whether the pressure is low body pressure, which is based on reducing tossing and turning, reducing the causes of bed-induced shifting. In the parenthetical, it says that this pressure for comfortable sleep is typically the ischemic threshold, which again tells us that it's not limited to the ischemic threshold. And again, this is consistent with the read of this patent as saying the ideal embodiment, the preferred embodiment. I mean, I understand your answer. I truly do. I want to ask you though quickly about column 1, lines 63 through 66. And that says that when parts of the body, usually the shoulders and hips and the conventional mattress, are subjected to pressures above the ischemic threshold, discomfort results and hence the person shifts to remove the discomfort and direct to tissue damage. Shouldn't I be reading that as saying that when the pressure is above the ischemic pressure, that's going to cause bed-induced shifting? Isn't the patent here pretty much stating that? Well, yes. Your Honor, your read of that sentence is right. The pressures above the ischemic threshold can cause tossing and turning. But the patent does not say that you must eliminate tossing and turning. The patent describes low body pressure as reducing, materially reducing the causes of bed-induced shifting. So if you go back to figure 10, you've got pressures of 80 at the shoulder and hips. If you reduce those pressures, and this is how our experts analyze the evidence, if you reduce those pressures of 80 down to say 45, you will reduce the number of shifts in the night. They're not eliminated, but the patent doesn't require eliminating that in an ideal mattress would get down to the ischemic pressure, which would either completely reduce or eliminate tossing and turning. But that's only in an ideal embodiment of the invention. It's not required in order to practice the invention. There are no statements in this patent that say the invention as a whole achieves, in all embodiments, sub-ischemic pressures. There's no reference to the ischemic pressure in the title or the abstract or the summary of the invention. It's mentioned in the kind of language that I was talking about earlier, where it describes some of the embodiments. If you choose carefully the right type of foam and tune the bed properly, you will achieve that. That's the preferred embodiment. It would be inappropriate to use that to limit the claims. Counsel, before you sit down, and I will give you some time for rebuttal, but this is Judge O'Malley. I just want to pin something down. So I assume that if we agree with you that there should be no upper limit as long as some comparison can be made to an innerspring mattress that you believe summary judgment was inappropriate because the calculations don't support a conclusion that there's no upper limit. There's no material issue of fact. And I assume that if we believe that the upper limit should be as set out in Figure 10, 80-40-80, that you also believe that summary judgment was inappropriate. My question is, if we agree with the district court that 40 is the upper limit, is there any basis to argue that summary judgment is inappropriate at that level? Well, Your Honor, I don't believe that the record evidence and the infringement contentions we made based on the original construction provide a basis to change the decision if 40 is an upper limit. I would go back to the point I made at the beginning that the evidence does show that the P-5 mattress achieves pressures of 43 at the maximum and an average of 17, which may very well infringe under the doctrine of equivalence. And that's something that just wasn't before us until the summary judgment order was issued. Okay. Thank you. All right. I'll restore your three minutes for rebuttal. And Mr. Cordell, if you need three more minutes, we'll give it to you, too. Mr. Cordell? Thank you, Your Honor. May I proceed? No, I have a question first before we start your clock. You have marked an inordinate amount of things as confidential. And essentially, much of the discussion of the pressure levels and the inventor testimony has all been marked as confidential. It's a little difficult for me to understand how something that was the basis for the court's summary judgment motion could ever remain confidential, but I guess I'm trying to understand how we talk to you about some of these calculations. Thank you, Your Honor. Much of what was designated in the supplemental appendix was – I can't say that it was all on our watch, if I can. It came from both sides. And I think what happened was, reflexively, when the court requested the additional appendix materials last week, we simply maintained those designations as had been set before the district court. I do not believe that much of that is confidential. So I think that if there are issues that come up during the argument, I'll highlight them, but I seriously doubt that we'll run afoul of any confidentiality concerns. Okay. One second. Mr. Day, do you agree with that? I agree with that, Your Honor. I think that is how the supplemental appendix was put together, and I frankly doubt there will be any discussion of anything Sleep Number thinks is confidential. I'm not concerned with confidentiality from Level Sleep's side with regard to this argument. Okay. Let's proceed then. Thank you, both. Thank you, Your Honor. May it please the Court, Ruffin Cordell for Sleep Number. I do agree that this is an appeal that is largely resolvable on claim construction. I think that the definitional statements that Judge Stoll asked about during my brother's time really does define the case. We have the happy fact that, in this case, the inventors actually gave us their view of the proper definition of the key term, low body pressure. Is it your view? Are you asking us to say that the district court's claim construction was actually wrong and that the maximum has to be the ischemic level, or are you saying that the district court's maximum of 40 is correct? The latter, Your Honor. The maximum of 40 is correct. Our fallback is, if for some reason you disagree with that, then we would adhere more closely to the definitional level given in the specification. Okay. But you agree that the maximum of 40 would come from the figures, correct? Yes. Okay. And if we're looking at the figures, why shouldn't we be considering 80-40-80? I believe it was in response to Judge Toronto's question that we have the follow-on passages in Column 16 that actually describe that anything over 30 is not low pressure. And so we can't simply say, well, as long as you're under 80 at any particular point, that that would suffice. For example, a shoulder. When we have the explicit disclosure at Column 16, and my citations are all to the 172 patent, by the way, that tell us that in order to be low pressure, you've got to be around 30 millimeters of mercury. So, it really would not. There's just no support anywhere in this specification for us to set a variable pressure and call it low pressure. Although it says that the experts all agreed that what we're really talking about here is the ischemic capillary pressure in human skin. And that skin doesn't change whether it's on your hip or shoulder or elbow. But I guess I'm still going back to, you're agreeing to 40, but you agree that 40 comes from the figures in the patent itself, right? Well, yes, Your Honor. So, to say that figures that Column 16, which talks about 30, supports the cap at 40 doesn't seem to make a lot of sense. Well, what we have is we take the specification and the conjunction of both Figures 10 and 11 together, and we know that 40 is too high, that we are told that. And so, really, the construction at 40 is one of convenience. We picked that number because that is sort of the best middle ground that the specification gives us. But the most pure application of the definitions given us by the patent would be 30. And that's why our fallback position is that if the court wants to be very strict in construing the claims according to the definitions given us in the specification, then we're down to 30. And it's not necessary for this to be. What do we make of Mr. Torbert's testimony that said that mattresses could have, that these pressure calculations are somewhat problematic because mattresses can show high pressure points when it's really some fluke or abnormality? That would be the button testimony. And that can happen, right? So, clothing sometimes has hard surfaces embedded in them, and that can create an ischemia at a point. But both sides essentially agree that those don't count. And what we're talking about here are persistent kinds of pressures created by mattresses and human bodies, not anomalies that might arise. But how do we know from the record that's submitted that, I mean, as he testified, he said that the mattresses could practice the patents in suit even though a pressure map shows points of pressure above 40. And we have pressure maps that show some points above 40. Did anyone do any analysis of those specific pressure points to determine if they are anomalies? What we have, Your Honor, is that Dr. Freese, the plaintiff's expert, was allowed to position her subjects in any way and in any manner that she chose. She actually used her daughter as a subject, a smaller person, and was free to position her in any way that she saw fit. And yet, the pressure map the plaintiff's expert herself created showed these pressures well above that 40 millimeters of mercury level. So, no one asked, you know, specifically... Well, actually, we may have, in her deposition, gone into this, but the point is she never attempted to explain those high-pressure zones as anomalies due to clothing. And frankly, given the number of them that she shows, it seems unlikely that that would be the case. Mr. Cordell, this is Judge Toronto. Can I ask you this question? Is there anything in the patent or the record that says whether 30 millimeters of mercury is the ischemic pressure for all human skin, no matter the person? The patent does have several citations equating the ischemic pressure with about 30 millimeters of mercury. About 30. About 30. And this is one point where the competing experts were in violent agreement. We have citations from both sides. Did anybody put any kind of, I don't know, numerical wiggle room on that figure of approximately 30? You know, what comes to mind is that each side had medical doctors that they offered. We had Dr. Krieger. They had Dr. Jacobson. So, for example, round appendix 8,000, supplemental appendix 8,000. I know Dr. Krieger had an extensive discussion of the ischemic pressure. It's actually, it looks like 7997, paragraph 17, and he has 30 to 32. And I think what the testimony was is that as people get older, that ischemic pressure actually goes down as capillaries age and you aren't as flexible. And so there are physiological problems that occur with people just as a result of the aging process. So, for example, older people have trouble in different parts of their bodies than younger do. So, I guess against that background, the 30 is not a terribly rigid number. I think even in the patent in column one when it says approximately 30, and if there's some room, then using 40 is just saying whatever that room is, 40 is above it. That's right. That's right. And I think that's what led the district court to resist a numeric limitation in the initial claim construction order. I do dispute that this was some kind of a surprise. I think in his initial order, the district court was quite clear that he was having trouble, you know, fixing that number given that there was this range between 30 and 32. And what he had was those statements and then the clear statement that 40 was too high. And so he thought that the experts would be able to then apply his reasoning as set forth in the Martland order very clearly. But that's not what happened. What happened was instead the level sleep experts resorted back to their conventional mattress analysis. And so in his summary judgment order at 823, he makes it clear that he expected the parties to be constrained by his too high a pressure reasoning of the claim construction order. And said explicitly at 823 that the court's original claim construction order explained the pressures above 40 millimeters of mercury are too high to satisfy the claim. Mr. Cordell, can I just ask one final question for myself about this indefiniteness business? I know that in your claim construction brief, you kind of advert to indefiniteness. But what, if anything, does the record say about whether a relevant skilled artisan would have a sufficiently definite idea of a spring mattresses pressure profile for that to give the kind of reasonable notice that the definiteness requirement demands? So framed as the spring mattress issue, your honor, there is nothing in the record, really. The first question that everyone would have to confront is what is a conventional spring mattress? There are thousands and thousands of choices. The level sleep expert chose one that I think was commercially available or perhaps fit for her testing profile, but really never explained why that one was chosen out of the thousands that could have been chosen. And we are all aware that people choose mattresses sometimes because they like a firmer mattress, sometimes because they like a softer mattress. And that's why when you go into the store, there are dozens and dozens available. And there's really nothing in this record that would allow one of ordinary skilled to know which of those to choose in the first instance. But is there something in the record that says among the many, many choices among spring mattresses, the pressure profiles would vary tremendously? I'm not aware of that, your honor, but I believe that's true. I think that the pressure profiles of conventional mattresses are specifically created, again, because people have different preferences. Sometimes they like it softer, sometimes they like it firmer. Okay. So that's a problem. Mr. Kurdel, this is Judge Stoll. I have a question that's analogous to the first one that Judge Toronto asked you about the ischemic pressure. I want to know if there's anything in the record that suggests, either in the patent specification or the record, that suggests that the ischemic pressure would change based on where the body part. For example, is it different for the waist than it is for the shoulder and hips? Is there anything that suggests that? No, your honor. In fact, the contrary would be true. So one of the discussions that I believe the court had with my brother was regarding column 30 where different body parts were highlighted. And in each case, for example, the citation at column 30, this is appendix 103, talked about the shoulder part of the side-lying male body. This is at lines 25 to 27, being supported with, quote, low surface body pressure. Down below that in column 30, there is a citation to the hip at about line 62. Displacement parameters accommodate the hip part of the side-lying male body. 35, again, with low surface body pressure. So there's no indication that this would be variable at all. And, in fact, the opposite contention is that 14 is back. Okay, thank you. I just want to note something, just for the record, that it's been a while since I've seen appendix copies of patents that were so poorly, that are so hard to read and illegible. And I just want to bring it to everybody's attention that it's much more helpful when higher quality images are put in the appendix. That's all. Thank you. Understood, Your Honor. I apologize. My eyes used to be good, but no more. If I could make just one final point. I do want to address this notion that there was a – somehow the court's construction was a surprise. I don't believe it was. There was extensive discussion of this pressure limitation and, indeed, a numeric pressure limitation at the Markman hearing beginning with appendix 1363. And I note that Levelsley did not ask the district court for leave to supplement anything or to reopen record at any point. So, you know, to the extent that that's an attractive argument, I think that it probably isn't maintained here. And with that, if there are no other questions, I'll exceed my time. Okay. Mr. Day, three minutes. Thank you, Your Honor. Just a few things. One, counsel said we're told that 40 is too high. Those words, too high, are not used in the patent. The patent does not say 40 is too high. And even the claim construction order did not say 40 is too high. So if it were, if you think about Figure 10, it shows you that there's pressure of 80, 40, 80, and then 30 at the legs. If 40 was some sort of an upper limit or, you know, definitional of what's too high, there'd be no point in talking about pressure double that at the shoulders. It's not an upper limit. It's not-the patent never says it's an upper limit. It's just not there to support such a statement. Second, counsel stated that anything over 30 is not low pressure. Again, the patent just does not say that. It says that in an ideal case, in a preferred embodiment, you would get to that level, but it never says low pressure means the ischemic pressure or low pressure means 30, pressure over 30 is too high. None of those kinds of statements are there. Instead, what we have is the objective baseline that it's pressure of a level which materially reduces bed-induced shifting. I do want to-on the indefiniteness question, there's no record here of, you know, thousands of conventional mattresses producing different results. I mean, that's something that clearly distinguishes this case from sleep numbers, citations to the Liberty Ammunition case, where there was a record showing that the, you know, the baseline, the conventional product, actually had all sorts of different properties that would change the results. There's no record of anything like that here, Your Honor. On the-what counsel referred to as the button test, you know, what's the deal with pressures over 40? Could it be an artifact? That was-in the summary judgment briefing, we pointed out that they never asked our expert that question, and frankly, our expert didn't address it in the report because that wasn't the construction we were dealing with, the 40 limit. But, you know, that just never came up because the construction was not before us. And finally, and this may turn to be a minor point, but counsel said that Dr. Freese chose a very small woman to do these tests, and that's not true. Her daughter's something like 5'10 and 180 pounds, certainly much bigger, and so the pressures are much higher than the person illustrated in Figure 10, who's a small woman of 2.5 percentile. And with that, I would like to thank the panel for your time today. Thank you. All right. The case will be submitted, and I promise, counsel, we won't sleep on our decision. Sorry, I'm challenging Alan already, so-candling me. Okay. All right. Thank you. The court is adjourned. Thank you, Your Honor. Thank you, Your Honors.